THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* RAMON P. WIERMAN, Defendant-Appellee.

Fourth District    No. 17644

Opinion filed June 15, 1982.—Rehearing denied July 12, 1982.

TRAPP, J., dissenting.

Paul L. Oglesby, Jr., Assistant State's Attorney, of Charleston, for the People.

Stephen R. Ryan, of Ryan, Grabb, Cini & Bennett, of Mattoon, for appellee.

JUSTICE LONDRIGAN delivered the opinion of the court:

Defendant was ticketed for driving under the influence of intoxicating liquor on August 6, 1981. The arresting officer filed an affidavit and report with the circuit clerk on August 7, 1981, detailing defendant's refusal to submit to a breath test. Defendant filed a petition for a hearing, as allowed by statute.

The hearing was held on October 26, 1981. The only witness called by either party was the arresting officer, Mark Finley. A summary of Officer Finley's testimony is presented below.

On August 6, 1981, at approximately 12 a.m., Officer Finley was on patrol on Lincoln Avenue at Fourth Street in Charleston. He was stopped at a stoplight, facing east. The light for westbound traffic turned green. Finley observed a black Buick begin to go forward, stop and then turn north onto Fourth Street. Finley made a left turn and followed the Buick at a speed of 20 to 25 miles per hour.

The Buick continued north on Fourth Street. The car was weaving back and forth in its lane, but did not cross the yellow center line. Finley followed the Buick to Fourth and Polk, where the driver waited at a four-way intersection. The driver of the Buick stopped for several seconds and then proceeded north. As the Buick went through the intersection, it crossed over into the southbound lane and then came back into the correct lane. The vehicle continued heading north to a point just beyond Tyler Avenue where it went into a gutter on the right side of the street. The driver jerked the car out of the gutter and crossed the center line again. Officer Finley turned on his flashers and stopped the car.

Finley identified the defendant as the driver of the vehicle. After Finley examined defendant's driver's license, defendant told Finley that he was looking for E.L. Kracker's, a bar located on Fourth Street. E.L. Kracker's is located about six blocks south of the point at which defendant was stopped by Officer Finley. Defendant told Finley that he had not been drinking.

Officer Finley had the defendant get out of his car. Defendant had to lean against the car to support himself. Finley had the defendant perform the finger-to-nose field sobriety test. Defendant was unable to complete this test. Finley noticed a faint odor of alcohol on defendant's breath. Defendant was also unable to walk a straight line. Officer Finley then informed the defendant that he was under arrest for driving while under the influence of intoxicating liquor.

After his arrival at the police station with the defendant, Finley first filled out a citation for driving while under the influence. He then filled out two copies of the "request to submit to test of breath" form. Finley handed one copy to the defendant and began reading the "nine points" contained on the form. Defendant continued to talk and demanded to make a phone call. Finley told him that he would be allowed to make a phone call after Finley had finished reading the form to him. After Finley finished reading the contents of the request form to the defendant, he allowed the defendant to make a phone call.

When defendant finished his phone call, Finley asked him if he would take the test. Defendant said he would but refused to sign the request form. Finley explained to him that a refusal to sign the form is deemed a refusal to submit to the test itself. Defendant stated, "I'm not signing nothing." Finley marked the request "refused" at 12:36 a.m.

Several minutes later, a man and a woman arrived at the police station and spoke with the defendant. The defendant then told Finley that he wanted to sign the form and take the test. Finley told him that he had already refused and that Finley "wasn't going to play around with it all night long."

On cross-examination, Finley stated that he had not delivered a copy of the ticket to the defendant before reading the request form to him. Finley stated that the defendant did request to call a lawyer during the time in which Finley read the request form to the defendant. Defendant was given his *Miranda* rights at approximately 12:40 a.m.

Defendant moved for judgment in his favor. The trial court granted the motion on the ground that defendant had not been issued a Uniform Traffic Ticket before he was requested to submit to the breath test. The State appeals from this ruling of the trial court.

Both parties agree that the central issue on appeal is whether the trial judge erred in finding for the defendant due to the arresting officer's failure to issue a Uniform Traffic Ticket to the defendant before requesting that defendant submit to a breath test.

Section 11—501.1 of the Illinois Vehicle Code (Ill. Rev. Stat. 1979, ch. 95½, par. 11—501.1) provides, in pertinent part:

"(a) Any person who, after September 30, 1972, drives a motor vehicle anywhere within this State thereby consents, under the

terms of this Section, to take and complete a test or chemical analysis of his breath to determine the alcoholic content of his blood when made as an incident to and following his lawful arrest, evidenced by the issuance of a Uniform Traffic Ticket, for an offense as defined in Section 11—501 of this Act or a similar provision of a municipal ordinance. * * *

* * *

If such person desires a hearing, he shall file a complaint in the Circuit Court for and in the county in which he was arrested for such hearing. Such hearing shall proceed in the Court in the same manner as other civil proceedings, except that the scope of such proceedings shall cover only the issues of whether the person was placed under arrest for an offense as defined in Section 11—501 of this Act or a similar provision of a municipal ordinance, whether the arresting officer had reasonable grounds to believe that such person was driving while under the influence of intoxicating liquor, whether the person was informed orally and in writing as provided in Paragraph (a) that his privilege to operate a motor vehicle would be suspended if he refused to submit to and complete the test and whether, after being so advised, he refused to submit to and complete the test upon request of the officer."

Defendant argues that the term "lawful arrest" under section 11—501.1 should be construed as requiring that the arresting officer issue the driver a Uniform Traffic Ticket before requesting that the driver take a breath test. The State contends that the trial judge erred in considering the question of whether a Uniform Traffic Ticket must be issued because the scope of the implied consent hearing is limited to the four issues set forth in section 11—501.1(d). In the alternative, the State argues that 11—501.1 should not be interpreted as requiring that the Uniform Traffic Ticket be issued before a request is made that the driver take the breath test.

The State cites *People v. Shorkey* (1974), 23 Ill. App. 3d 662, 321 N.E.2d 46, for its contention that the question of whether a ticket has been issued may not be considered at the implied consent hearing. In *Shorkey*, defendant refused to submit to a breath test after being arrested for driving while under the influence of alcohol. He petitioned for a hearing under the statute. Shorkey argued that he was not bound by his initial refusal to submit to the test and was, according to the statute, entitled to 90 minutes in which to decide whether to submit to the test. The trial court found for Shorkey, and the State appealed.

On appeal, the trial court's decision was reversed and remanded. Shorkey argued, as does the defendant in the present case, that the arresting officer was required to issue a ticket before requesting that the driver submit to a breath test. The First District rejected this argument

because defendant had stipulated to all the elements required to be proved at the implied consent hearing. Therefore, the State was not required to make any further proof of those elements.

■■ *Shorkey* did not answer the precise question raised in this case. Defendant made no stipulation on any matter involved in the implied consent hearing. Defendant's position is that without the issuance of a traffic ticket before the request to submit to a breath test, a lawful arrest was not made within the requirements of sections 11—501.1(a) and 11—501.1(d).

Section 11—501.1 is silent on the question of when the Uniform Traffic Ticket must be issued. No Illinois court has spoken directly on this issue. There are very few, if any, cases from other jurisdictions which are directly on point. An analogous situation was decided by the Pennsylvania court in *Commonwealth v. Ebert* (1977), 31 Pa. Commw. Ct. 82, 375 A.2d 837.

*Ebert* involved the interpretation of the Pennsylvania implied consent statute which provided that a driver must be "formally charged" with driving while intoxicated before the breath test is administered. The driver, Ebert, refused to submit to the breath test. His driver's license was suspended and he appealed the suspension.

On appeal, Ebert contended that he had not been formally charged before he was asked to take the breath test. The court rejected Ebert's arguments and affirmed the suspension. The court held that the legislature did not intend to require a formal charge prior to the request to submit to a breath test. The purpose of the implied consent law was to get intoxicated drivers off the highways. Since "evidence" of intoxication dissipates rapidly, the court reasoned, requiring a formal charge before the request to submit to the breath test would frustrate the purpose of the statute. The court interpreted "formally charged" as requiring that the driver be informed that he is under arrest before the request to submit to the breath test is made.

We agree with the reasoning of the court in *Ebert*. The purpose of the Illinois implied consent statute is to promote highway safety by eliminating drunken drivers from our State's highways. Requiring that a ticket be issued to a driver before he is asked to submit to a breath test could, in some cases, increase the amount of time which elapses between apprehension and the breath test, thereby making it more difficult to accomplish the statutory purpose.

Subsection (d) provides that one of the four issues within the scope of an implied consent hearing is whether the driver was placed under arrest for a violation of section 11—501. "Arrest" is defined in section 102—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 102—5) as "the taking of a person into custody." Officer Finley testified

that he informed the defendant at the scene that he was under arrest for driving while intoxicated. The issuance of a Uniform Traffic Ticket is not necessary to make a valid arrest for a traffic violation; a traffic ticket, along with an indictment and an information, is merely one type of charging instrument used in traffic cases. *Cf.* 4A Ill. L. & Prac. *Automobiles & Motor Vehicles* sec. 393 (1971).

We construe section 11—501.1(a) as requiring that a Uniform Traffic Ticket evidence the fact that an arrest was made. The ticket must be issued to the defendant but need not be issued before the request to submit to the breath test is made.

The trial court erred in reading into section 11—501.1 a requirement that the arresting officer issue a traffic ticket before asking the defendant to submit to a breath test. Such a requirement is both contrary to the legislative purpose behind the implied consent law and an incorrect interpretation of the language used in section 11—501.1.

■■ At oral argument, defendant's counsel argued that defendant did agree to take the test within the 90-minute period provided by the statute. An examination of the record reveals that defendant at first refused to sign the written consent form. He stated, "I'm not signing nothing." The officer informed him that a refusal to sign the consent form constituted a refusal to submit to the test itself. Defendant persisted in his refusal. A few minutes later, defendant informed the officer that he was willing to take the test. The officer refused to administer the test because defendant had previously refused to submit.

The First District ruled on this issue in *Shorkey*. The court followed the courts in sister States in holding that if defendant refused to submit to the test, the refusal is final. Defendant refused to sign the consent form. He was advised that this constituted a refusal to submit to the test. He persisted in his refusal to sign the consent form. He was not entitled to a second chance.

The judgment of the circuit court of Coles County is reversed and remanded for a new implied consent hearing in accordance with the views expressed herein.

Reversed and remanded.

GREEN, P. J., concurs.

JUSTICE TRAPP, dissenting in part:

I dissent from that portion of the opinion which permits the arresting officer to foreclose the taking of the test within 90 minutes after the giving of the statutory admonition.

Section 11—501.1 of the Illinois Vehicle Code (Ill. Rev. Stat. 1979, ch.

95½, par. 11—501.1) states and reiterates the legislative pattern that a person arrested shall have 90 minutes in which he may decide to take the "test." Section (a)(2) states the required admonition:

"(2) that he may refuse to submit to either such analysis and that his refusal to submit to either analysis within 90 minutes after receiving the notice may result \* \* \*."

A further admonition provides:

"(3) that he may consult with an attorney or other person by phone or in person within that 90 minutes."

Finally, the statute states its purport:

"After being so advised the arrested person may study the written notice and may consult with an attorney or other person by phone or in person *but refusal to submit to the test within 90 minutes after being given the written notice shall constitute a refusal to take the test.*" (Emphasis added.)

The last quoted portion of the statute defines "a refusal to take the test" as the "refusal *to submit* to the test within 90 minutes." (Emphasis added.)

The admonitions establish, in plain language, that there is a period of 90 minutes in which the person arrested has to inquire, consult and determine whether or not to submit.

The principal opinion is grounded upon the several events in a time sequence working back from the refusal endorsed "12:30 a.m." The "stop" is said to have been near midnight. There were the events of identification and field tests at the scene with the incidental conversations and the time required to transport the defendant to the police station, together with the completion of the forms and the reading of them. Defendant was permitted to make a telephone call, but the officer required that he answer the demand that he take the test before defendant had an opportunity to confer with his attorney or other person whom he called. So far as it appears, the officer did not ascertain whether or not defendant expected to confer with an attorney. Thus, when defendant had had an opportunity to consult, he was thwarted by the trick of time devised by the officer and the rule followed here. So far as it appears, defendant agreed to the test within minutes of his consultation, and within minutes of "receiving the notice."

The carefully stated legislative scheme may thus be thwarted and avoided and made meaningless by an official technique of making an immediate demand as to whether or not the person will take the test. Only an extraordinarily sophisticated person might devise a precisely worded response that he had 90 minutes in which to decide to take the test. If such response is not ruled a refusal, virtually any other immediate answer would be so ruled. The mild reproof in the principal opinion is not suffi-

cient to inhibit the method used to destroy the effect of the statute and bar effective consultation with an attorney.

The text of the opinion in *Shorkey* does not state such details as would permit a determination of whether the court considered the factors presented.

If the operation of the statute, as written, creates an onerous burden for the police services, the remedy is to be determined by the legislature rather than through a distortion of the plain language of the statute.